UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

REBECCA MCNEIL, *et. al.*,

    **Plaintiffs**,

v.

MOUNT CARMEL HEALTH SYSTEM, *et. al.*,

    **Defendants**.

Case No. 2:20-cv-258
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

**OPINION AND ORDER**

The matter before the Court is Defendants Mount Carmel Health System ("Mount Carmel"), Trinity Health Corporation ("Trinity Health"), and Edward Lamb's (collectively "Defendants") Motion to Dismiss. (ECF No. 21.) Plaintiffs Rebecca McNeil, Beth Macioce-Quinn, Earlene Romine, Edward Wright, Brandi Wells, Akeela Bowens, Chad Readout, Jessica Sheets, and Deron Lundy (collectively "Plaintiffs") have responded, (ECF No. 22), and Defendants have replied. (ECF No. 23.) For the reasons stated below, Defendants' Motion to Dismiss (ECF No. 21) is **GRANTED in part** and **DENIED in part**.

**I.**

Plaintiffs are nine former employees of Mount Carmel who worked with and around the "now-publicly-vilified" Dr. William S. Husel. (Compl. at ¶ 1, ECF No. 8.) They have sued Defendants asserting, *inter alia*, a cause of action for defamation.[1] (Notice of Removal, ECF No. 1; Compl. at PageID# 512, ECF No. 8.) Because Defendants move to dismiss Plaintiffs'

---

[1] Plaintiffs assert other causes of action that are not the subject of Defendants' motion. (Compl. at PageID# 523, 524, 526, ECF No. 8.)

defamation cause of action under Federal Rule of Civil Procedure 12(b)(6), the allegations in the Complaint are taken as true and are as follows:

During the years that Plaintiffs worked with and around Dr. Husel, some of the patients who were admitted to ICUs suffered from grave medical conditions, and occasionally the families of these patients would request for life support to be withdrawn so that the patient's suffering might be abated. (*Id.* at ¶ 2.) In preparation for cases like these, the staff of these ICUs developed policies and procedures designed to alleviate patient suffering and provide care until the end. (*Id.* at ¶¶ 3, 169.) These policies and procedures were approved by senior management at Mount Carmel and remained practically unchanged from 2014 until 2018. (*Id.* at ¶ 3.) They did not, however, include any policies or guidelines for "dosing of pain medication in connection with palliative extubation." (*Id.* at ¶ 141 (emphasis removed).)

Mount Carmel had a system in place whereby employees could submit a "voice report" detailing any work-related concern. (*Id.* at ¶ 209.) On October 26, 2018, Katie Barga, the Vice President of Risk Management at the hospital, submitted a voice report expressing concern over Dr. Husel prescribing 1000 mcg of fentanyl during a palliative extubation of a patient the previous night. (*Id.* at ¶ 219.) On November 19, 2018, a second voice report was filed regarding Dr. Husel's ordering of 1000 mcg of fentanyl for use on a patient prior to palliative extubation. (*Id.* at ¶¶ 230, 235.) A few days later, on November 21, a pharmacist filed a third and final voice report, this one concerning Dr. Husel's written order of 2000 mcg of fentanyl for use on a patient with a significant opioid tolerance. (*Id.* at ¶¶ 264, 266.) That day, a meeting was held, including Katie Barga, Sean McKibben (President and Chief Operating Officer), Janet Whittey (Chief Pharmacy Officer), Mavis Kramer (Director of Patient Care Services), Dina Bush (Chief Nursing Officer), Dr. Larry Swanner (Vice President of Medical Affairs), and Plaintiff Romine. Following the meeting,

McKibben instructed Dr. Swanner to place Dr. Husel on leave. (*Id.* at ¶ 268.) Dr. Swanner let Dr. Husel know soon after that he was suspended. (*Id.* at ¶ 270.)

In December of 2018, "Mount Carmel fired Dr. Husel, put 20 staff on leave, contacted a homicide detective, and called the families of 26 patients to tell each of them that their loved ones had been given a 'fatal' dose of fentanyl (even though no such thing had occurred)." (Compl. at ¶ 29, ECF No. 8.)

On December 7, 2018, Plaintiff Romine was told she was being placed on administrative leave "while the investigation was conducted." (*Id.* at ¶ 307.) She was briefly taken off leave on December 10, 2018, but was again placed on leave on December 21, 2018, after being told she "had 'impeded' the hospital's own investigation." (*Id.* at ¶¶ 324, 395–97.)

On January 14, 2019, the CEO of Trinity Health released a statement that began:

> Mount Carmel Health…recently reported to authorities the findings of an internal investigation regarding a doctor who provided intensive care. Over the last four years, this doctor ordered significantly excessive and potentially fatal doses of pain medication for at least 27 patients who were near death. . . ."

(*Id.* at ¶ 427.) The statement continued:

> Following the discovery, the doctor was removed from all patient care, and his employment was terminated. We're working hard to learn all we can about these cases, and we removed 20 other hospital staff from providing further patient care while we gather more facts. This includes a number of nurses who were administering the medication and a number of staff pharmacists who were also involved in the related patient care.

(*Id.*) The CEO of Mount Carmel, Edward Lamb, published a virtually identical statement that same day, while at the same time issuing a video release to the public in which he stated: "[t]he actions that created this tragedy were . . . carried out by a small number of people who made poor decisions. [W]e can't disregard colleagues ignoring policies and putting our patients' safety at risk." (*Id.* at ¶ 429.)

3

Thereafter, in late January, Plaintiff McNeil was placed on leave and ultimately terminated by the hospital. (*Id.* at ¶ 444.) On January 30, Mount Carmel issued another public statement: "We have now placed 23 colleagues on administrative leave, including members of the management team." (*Id.* ¶ 458.)

Mount Carmel and Edward Lamb then issued another statement on March 13, 2019, including:

> We have identified a total of 48 nurses and pharmacists whose actions are under review and whose names have been reported to the relevant nursing and pharmacy boards. Out of an abundance of caution, we have removed all colleagues who were associated with medication administration for an impacted patient. In total, 30 colleagues are on administrative leave . . . .

(*Id.* at PageID# 541, 547). That same day Plaintiffs Bowen, Sheets, Macioce-Quinn, Wells, and Lundy had been placed on administrative leave pending the outcome of the hospital's investigation. (*Id.* at ¶ 486.) Plaintiffs Wright and Readout were not placed on administrative leave as they were former employees, (*Id.* at ¶¶ 52, 56), but they were "reported to the Board of Nursing in connection with Mount Carmel's announcement . . . ." (*Id.* at ¶¶ 636, 662).

After several months, Plaintiffs Romine, Macioce-Quinn, Bowens, Sheets, Wells, and Lundy were terminated by Mount Carmel on July 11, 2019. (*Id.* at ¶ 495.) That day, Mount Carmel and Edward Lamb issued a statement reading in part: "We are terminating the employment of 23 colleagues—including 5 physician, nursing and pharmacy management team members—effective today." (*Id.* at PageID# 550.)

## II.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,'" but pleadings cannot consist only of "labels and conclusions," "formulaic recitation[s] of the

4

elements of a cause of action," or "'naked assertion[s] devoid of "further factual enhancement."'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). To survive a motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a plaintiff must 'allege[ ] facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level."'" *Mills v. Barnard*, 869 F.3d 473, 479 (6th Cir. 2017) (citation omitted). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts must "construe the complaint in the light most favorable to the plaintiff and accept all [well-pleaded factual] allegations as true." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)).

### III.

To establish defamation under Ohio law, the Plaintiffs must show:

> (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement.

*Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012). When spoken, a defamatory statement is slander, and when written it is libel. *Gosden v. Louis*, 687 N.E.2d 481, 488 (Ohio Ct. App. 1996). Defamation can be *per se* or *per quod*. A statement is defamatory *per se* when it is defamatory on its face, while a statement is defamatory *per quod* when the defamatory nature of the statement is implicit and comes in the form of an innuendo. *Id*.

To be actionable, the defamatory statement must be "of and concerning" an individual plaintiff. *Whiteside v. United Paramount Network*, 2004-Ohio-800, ⁋ 15, 2004 Ohio App. LEXIS

5

738 (Ohio Ct. App. 2004) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964)). That is, "an individual plaintiff must be clearly identifiable to support a claim for defamation." *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) (citing *New York Times Co.*, 376 U.S. at 288–89). A plaintiff does not need to be defamed by name for the statement to be actionable. When the plaintiff is unnamed, the statement is still deemed to be of and concerning the plaintiff if "recipients of the communication understood it to refer to that person." *Gosden*, 687 N.E.2d at 495.

The matter is somewhat different when the defamatory statement is made against not just one person in the singular, but a number of people as a group. When the defamatory statement is made against a group, the individual group members may still bring defamation actions, but only under narrow circumstances. This is known as the group libel doctrine. Under this doctrine a plaintiff can maintain a defamation cause of action when the defamatory statement is made against a group of people, but only if the group is small enough that the defamation can reasonably be understood to have been directed at the individual member, or the circumstances of the publication reasonably give rise to the conclusion that the member is being particularly referenced. *Frost v. Nemeth*, 1987 WL 18847, *3 (Ohio Ct. App. 1987) (citing Restatement (Second) of Torts § 564A (1997)). These parameters essentially re-calibrate the of and concerning element to fit statements that are made against a group of people rather than an individual.

Defendants first ask this Court to dismiss Plaintiffs' defamation count in the entirety, contending that the statements should be analyzed as group libel and deemed not of and concerning the Plaintiffs. (Def. Mot. to Dismiss at 6, ECF No. 21.) Plaintiffs, on the other hand, submit that their cause of action is not based on a theory of group libel, but that even if it was the action would still survive. (Resp. at 9, 18, ECF No. 22.) If this is individual defamation, the issue is whether the "recipients of the communication understood it to refer to that person." *Gosden v. Louis*, 687

6

N.E.2d 481, 495 (Ohio Ct. App. 1996). If it is group libel, the issue is whether the circumstances reasonably give rise to the conclusion that the member is being particularly referenced. *Frost*, 1987 WL 18847 at *3. In either event the goal is to determine whether the statements were made of and concerning the individual Plaintiffs.

Starting at the beginning, Trinity Health first published a written statement on January 14, 2019. (Compl. at PageID# 539, ECF No. 8.) This statement is properly analyzed as group libel. Indeed, the statement itself illustrates the difference between group and individual defamation. Trinity Health stated, "this doctor ordered significantly excessive and potentially fatal doses of pain medication for at least 27 patients who were near death and receiving intensive care." (*Id*.) This is a model example of a statement concerning a clearly identifiable and singular individual: Dr. Husel. In contrast, further down in this publication Trinity Health stated, "we removed 20 other hospital staff from providing further patient care while we gather more facts. This includes a number of nurses who administered the medication and a number of staff pharmacists who were also involved in the related patient care." (*Id.*) The difference is plain to see. One statement concerns an individual, one concerns a group. The claims brought by the group members based on this publication, therefore, are analyzed using the group libel doctrine.

Defendants contend that the group is too large to support a defamation claim and assert that Plaintiffs have not alleged that the statements were directed at them particularly. (Def. Mot. to Dismiss at 12, ECF No. 21.) The Plaintiffs do not attempt to rebut the issue of group size, instead submitting that the "circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the Plaintiffs . . . ." (Resp. at 18–19, ECF No. 22 (quotation omitted).) As Plaintiffs recognize, "it is for the court, in the first instance, to determine if the alleged libel is reasonably capable of bearing an application to the plaintiffs, and only if such a

7

construction is possible will the case go to the jury for a determination of whether the publication did, in fact, concern the plaintiffs." *Michigan United Conservation Clubs v. CBS News*, 485 F.Supp. 893, 897 (W.D. Mich. 1980).

Trinity Health's January 14, 2019, statement is not reasonably capable of bearing an application to Plaintiffs, other than Plaintiff Romine. Defamatory publications are read within the context that they are published. *See Connaughton v. Harte Hanks Communication, Inc.*, 842 F.2d 825, 840 (6th Cir. 1998) (addressing whether an article was defamatory); *see also* Restatement (Second) of Torts § 564A cmt. d. (1997). On January 14, 2019, the context did not suggest that Plaintiffs, other than Plaintiff Romine, were the targets of the statement. The statement was written in the past tense ("we removed") but at that point only Plaintiff Romine was on leave. (*Compare* Compl. at PageID# 539 *with* Compl. at ¶¶ 395–97, 445–46, 486.) Plaintiffs allege that the group was well enough defined for family, friends, acquaintances, and employers to know that each Plaintiff was part of the group. (Compl. at ¶ 605, ECF No. 8.) But with respect to this publication, that proposition is internally inconsistent for every Plaintiff except Romine. The group was well enough defined for people to know that these publications were made of and concerning those employees who were placed on administrative leave as of January 14, 2019, and that group only includes Plaintiff Romine.

In contract to the other Plaintiffs, this statement is reasonably capable of bearing an application to Plaintiff McNeil. Not only was Plaintiff Romine on leave at the time of the statement, she had also been told her leave related to the investigation. (*See Id.* at ¶¶ 307, 395–97.) Given these circumstances, it is plausible that Plaintiff Romine was one of the 20 hospital staff referred to in Trinity Health's statement. The statement was made "of and concerning" Plaintiff Romine.

8

Trinity Health only published one additional statement: the statement it posted to its website. (Compl. at PageID# 540–41.) This undated publication is similar to the statement addressed above. Relevant to the of and concerning element, it states that along with removing the doctor, they also "removed 20 other hospital staff from providing further patient care while we gather more facts." (*Id.*) Though the publication is undated, the number of removed staff in this posting is the same as in the January 14 publication, and nothing in the Complaint suggests that this statement concerned a different 20 staff members. Here, as before, the circumstances reasonably indicate that Trinity Health was making particular reference to Plaintiff Romine, but none of the other Plaintiffs, as only Plaintiff Romine was among the initial 20 staff members that were placed on administrative leave. As such, this Court finds that Trinity Health's allegedly defamatory statement are reasonably capable of bearing an application to Plaintiff Romine only.

Turning to the statements made by Mount Carmel and Edward Lamb, the Court begins again with their January 14, 2019 statements. That day Lamb issued a statement on behalf of Mount Carmel that was virtually identical to Trinity Health's January 14 statement, while also adding a video wherein Lamb stated that "a small number of people" made "poor decisions." (Compl. at ⁋ 429.) Hearing the "small number of people" video statement outside the context of the written statement, the language is vague and the target unascertainable. (*Id.*) But, viewing the video statement in the context of Lamb's simultaneously issued written statement, the language becomes a short-hand reference to the "20 hospital staff" who had been placed on administrative leave. (*Id.* at PageID# 541–42, ECF No. 8.) Again, that group only includes Plaintiff Romine. These January 14, 2019, statements were made of and concerning Plaintiff Romine, but none of the other Plaintiffs, and only Plaintiff Romine can build a defamation cause of action upon them.

The Court now turns to Mount Carmel's January 30, 2019, response to the media. (Compl. at PageID# 545, ECF No. 8.) The analysis remains the same for all Plaintiffs except Plaintiff McNeil. By January 30, 2019, Mount Carmel had placed an additional three employees on administrative leave and published a statement which provided in pertinent part: "We have now placed 23 colleagues on administrative leave, including members of the management team." (*Id.*) Plaintiff McNeil was placed on administrative leave in late January. (Compl. at ¶¶ 445–46.) Given the close proximity in time, the statement is reasonably capable of bearing an application to Plaintiff McNeil. Put another way, it is plausible that Plaintiff McNeil was one of the 23 colleagues referred to in Mount Carmel's statement. The statement was "of and concerning" the Plaintiff.

Next, the Court turns to the March 13, 2019, media statement by Mount Carmel and Edward Lamb. (Compl. at PageID# 547–48, ECF No. 8.) The statement provides, *inter alia*, that Mount Carmel "[r]emoved from patient care any colleague who was in any way part of medication administration for an impacted patient" and that "30 colleagues are on administrative leave . . . ." (Compl. at PageID# 547–48, ECF No. 8.) In this publication Mount Carmel also stated that they "have identified a total of 48 nurses and pharmacists whose actions are under review and whose names have been reported to the relevant nursing and pharmacy boards." (*Id.* at PageID# 548.) On the day of this publication, March 13, 2019, Plaintiffs Bowens, Sheets, Macioce-Quinn, Wells, and Lundy were placed on administrative leave "pending the conclusion of hospital's Investigation [sic]." (*Id.* at ¶ 486.) Plaintiffs Wright and Readout allege that they were among those "reported to the Board of Nursing in connection with Mount Carmel's announcement . . . ." (*Id.* at ¶¶ 636, 662). Based on these circumstances, it is plausible that Mount Carmel and Edward Lamb made this statement of and concerning Plaintiffs Bowens, Sheets, Macioce-Quinn, Wells, Lundy, Wright, and Readout.

Accordingly, no Defendant is entitled to a full dismissal of the defamation count based on the group libel doctrine. The Court turns to Defendants' second argument.

Defendants submit that if the Court will not dismiss the defamation count in the entirety, it should nonetheless find that certain of the allegedly defamatory statements were not made of and concerning Plaintiffs.[2] (*See* Def. Mot. to Dismiss at 16, ECF No. 21.) Plaintiffs respond that such a request is a premature motion in limine, and that Defendants cannot parse their statements into fragments in this manner. (Resp. at 2, 19 ECF No. 22.) Both parties are correct in part.

Attached as Exhibit D to their Complaint, Plaintiffs included twenty statements made by the Defendants at different times, which Plaintiffs allege to be defamatory. (Compl. at ¶ 609, ECF No. 8.) This Court has already addressed some of them above. It is unclear whether Plaintiffs are attempting to bring numerous causes of action, each based on a different one of these statements, or whether Plaintiffs are attempting to bring a single cause of action based on a collection of statements. In construing this as a single cause of action, this would have a similar practical effect to agreeing with Defendants' second argument in the entirety. Therefore, for the purposes of this motion the Court understands Plaintiffs to be raising a different cause of action based on every allegedly defamatory statement that was separately published.

Many of the allegedly defamatory statements published by Defendants were not made of and concerning the individual Plaintiffs. For example, Mount Carmel's January 22, 2019, response to the media is one such published statement. In the entirety this statement reads:

> Based on what this doctor did to these near-death patients, we understand that some of these families may be considering legal action. We've apologized to these families, we've apologized publicly, and we're continuing to cooperate with law

---

[2] Defendants do not raise this argument with respect to Mount Carmel's January 15, 2019, response to media; January 16, 2019, response to media; January 18, 2019, response to media; January 30, 2019, response to media; or February 1, 2019 media statement and response to media. (*See* Def. Mot. to Dismiss at PageID# 719–20, 729, 731–32, ECF No. 21.)

11

enforcement and other authorities. We're also working to build additional safeguards so that a tragedy like this never happens again.

(Compl. at PageID# 543–44.) This statement was made of and concerning Dr. Husel specifically. The Plaintiffs were not mentioned by name, they were not mentioned using pronouns or titles, and they were not mentioned as a group. Whether this statement is contextually relevant to the separately published statements of and concerning Plaintiffs is a question not presently before the Court. This statement, however, is not a defamatory statement of and concerning Plaintiffs, and thus it cannot serve them as the foundation for a cause of action.

For the same reason, the following statements by Mount Carmel were not made of and concerning the individual Plaintiffs: (1) the January 24, 2019, media statement; (2) the January 25, 2019, response to media; (3) the February 22, 2019, media statement; (4) the February 25, 2019, response to media; (5) the March 15, 2019, response to media; (6) the April 17, 2019, media response; (7) the April 22, 2019, media response; and (8) the May 24, 2019, response to media. (Compl. at PageID# 544–47, 549, ECF No. 8.) None of these statements makes any reference to Plaintiffs. To the extent that Plaintiffs are attempting to base separate causes of action upon these statements, they too are deficient.

However, Plaintiffs are correct that Defendants may not fragment statements that were made within a single publication. To illustrate, on March 14, 2019, Mount Carmel published the statement, that, *inter alia*, "we placed all nurses who were associated with medication administration for an impacted patient on paid administrative leave until ongoing investigations provide a complete understanding of individual nurse's actions." (Compl. at PageID# 548–49.) Defendants do not address this part of the publication, focusing instead on a different sentence wherein Mount Carmel expressed its sympathies for the families of the affected patients. (Def. Mot. to Dismiss at PageID# 721, ECF No. 21.) As previously mentioned, an allegedly defamatory

12

statement must be read in context, which includes the context of the entire publication. *See Connaughton v. Harte Hanks Communication, Inc.*, 842 F.2d 825, 840 (6th Cir. 1998). Here, that includes the sentence of this publication quoted just above, which allegedly implicates certain nurses in the wrongdoing. (Compl. at PageID# 539, 548–49, ECF No. 8.) Because Defendants do not address the part of the publication that is most salient to the element that they contend is deficient (the of and concerning element), their argument is not well taken here. The same holds true for the July 11, 2019 publication. (*Id*. at PageID# 549–51.)

### IV.

For the reasons stated above, Defendants' Motion to Dismiss (ECF No. 21) is **GRANTED in part** and **DENIED in part**. No parties are to be dismissed.

    IT IS SO ORDERED.


**3/17/2021**                                            **s/Edmund A. Sargus, Jr.**
**DATE**                                                   **EDMUND A. SARGUS, JR.**
                                                            **UNITED STATES DISTRICT JUDGE**