**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**REBECCA MCNEIL, et al.,**

      **Plaintiffs,**

      **v.**

**MOUNT CARMEL HEALTH SYSTEM,**
**et al.,**

      **Defendants.**

      **Case No. 2:20-cv-258**
      **Judge Edmund A. Sargus**
      **Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Protective Order (Doc. 50), and Plaintiffs' Cross Motion to Compel Discovery (Doc. 54). For the following reasons, Defendants' Motion for Protective Order (Doc. 50) is **DENIED** and Plaintiffs' Cross Motion to Compel Discovery (Doc. 54) is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

The Undersigned previously summarized the factual background of this case:

This is a defamation case arising from the alleged actions of former Mount Carmel Health System ("Mount Carmel") physician, Dr. William Husel. In January 2019, Mount Carmel released a public statement that one of its former ICU physicians had administered "excessive and potentially fatal" doses of Fentanyl to 27 patients. (Doc. 8, ¶ 32). According to the statement, this physician did not act alone—ICU nurses and pharmacists also "made bad decisions" and "ignor[ed] policies," placing "patients' safety at risk." (*Id.*). Mount Carmel terminated the allegedly complicit ICU employees, and in June 2019, Dr. Husel was indicted for 25 counts of murder. (*Id.*, ¶¶ 41, 43).

Plaintiffs, ten former Mount Carmel ICU employees, say they were made to be scapegoats. According to them, Mount Carmel and its Michigan-based parent company, Defendant Trinity Health Corporation ("Trinity"), "panicked" about the rise of criminal and administrative actions against healthcare providers associated with the nationwide opioid epidemic. (*Id.*, ¶ 21). Specifically, they feared the public or regulators would learn that Mount Carmel ICU patients sometimes received high doses of Fentanyl. (*Id.*, ¶ 28). Plaintiffs acknowledge that, in some cases, they did. (*See id.*, ¶¶ 2–5, 18–26). But according to them, nothing improper,

let alone criminal, occurred. (*See id.*). Rather, they say medical literature recommends high doses of certain opioids to ease a patient's suffering between the removal of life support and death. (*See id.*). And Mount Carmel physicians and nurses had discretion in these circumstances based upon the individual needs of their patients. (*Id.*, ¶¶ 17–19).

Nevertheless, Defendants were concerned about optics. (*Id.*, ¶ 27). Following several internal complaints regarding Dr. Husel's use of opioids, the veracity of which Plaintiffs question, Defendants allegedly spun a "rogue doctor" narrative to "explain" any perceived wrongdoings associated with the use of opioids. (*Id.*, ¶ 28). Mount Carmel abruptly changed its opioid policies and publicly blamed Dr. Husel and dozens of ICU employees for the deaths of 27 patients. (*Id.*, ¶¶ 27–28). Plaintiffs say that their personal and professional lives were left in tatters. (*Id.*, ¶¶ 43–47).

(Doc. 33 at 1–2).

For over a year, the parties have been engaged in discovery, working towards a deadline set for October 18, 2021. (Doc. 43). On July 14, 2021, the parties came to the Court with outstanding discovery disputes, and the Court subsequently adopted their proposed schedule for briefing them. (Doc. 48). Accordingly, Defendants filed a Motion for Protective Order (Doc. 50); Plaintiffs responded in opposition with a Cross Motion to Compel Discovery (Doc. 54); and Defendants filed a Reply in support of the Motion for Protective Order (Doc. 60). The parties then jointly represented that they would not submit further briefing related to the motions. (Doc. 61). So, the motions are ripe for consideration.

During the pendency of these motions, the deadline for discovery elapsed. (Doc. 43). Accordingly, the parties request that the deadlines set out by the current scheduling order be vacated, and the parties given leave to propose amended deadlines.

## II.    STANDARD

Under Rule 26(b) of the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Determining the proper scope of discovery

falls within the broad discretion of the trial court." *Gruenbaum v. Werner Enter., Inc.*, 270 F.R.D. 298, 302 (S.D. Ohio 2010) (citing *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)).

Still, a party may resist disclosure under certain circumstances. Rule 26(c)(1) protects a party or entity from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "To sustain a protective order under Rule 26(c), the moving party must show 'good cause' for protection from one (or more) harms identified in Rule 26(c)(1)(A) 'with a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements.'" *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016), *cert. denied sub nom*. *Fears v. Kasich*, 138 S. Ct. 191 (2017) (quoting *Serrano v. Cintas Corp*., 699 F.3d 884, 901 (6th Cir. 2012)). "Good cause exists if 'specific prejudice or harm will result' from the absence of a protective order." *In re Ohio Execution Protocol Litig*., 845 F.3d at 236 (quoting *Father M. v. Various Tort Claimants* (*In re Roman Catholic Archbishop*), 661 F.3d 417, 424 (9th Cir. 2011)). Ultimately, "Rule 26(c) confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). "The burden of establishing good cause for a protective order rests with the movant." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (citation omitted).

Additionally, a party may move to compel discovery under Rule 37 when the opposing party fails to provide proper responses to requests for production. Fed. R. Civ. P. 37(a)(3)(B)(iv).

## III. DISCUSSION

Defendants seek a protective order against three of Plaintiffs' Requests for Production, Nos. 37, 40, and 41:

37. Any and all documents and/or communications (including but not limited to scripts, draft scripts, documents or communications concerning scripts) referring or

3

relating to proposed or actual communications with family members or estate representatives of any of the 35 Patients created on or after December 1, 2018, as well as any audio or written record of such communication (whether verbatim or not).

40. All documents reflecting media strategies or other plans for communicating with the public concerning the 35 Patients (whether by name or anonymously) or the Internal Investigation either generally or with respect to specific issues.

41. All documents reflecting media strategies or other plans for communicating with the public concerning actions taken or purportedly taken by Defendants as a result of the Internal Investigation.

(Doc. 50 at 6–7). These communications and media strategies were developed and implemented by Defendants' Incident Command Team, a cohort of employees tasked with public relations in "response to the allegations regarding Dr. Husel's patient care[.]" (Doc. 50 at 3). Of the forty-two members of this team, three were lawyers. (Doc. 54-1 at 6 (citing Doc. 54-2, ¶14; Doc. 54-9)). Those members were: Mandi A. Murray, Vice President and Managing Counsel of Provider Operations; Daniel Hackett, in-house counsel for Mount Carmel; and Linda Ross, in-house counsel for Trinity. (Doc. 50 at 2–3; Doc. 50-2).

Defendants represent that these communications and media strategies are protected by the attorney-client privilege and work-product doctrine. (Doc. 50 at 7). To support their assertions, Defendants have produced several versions of a privilege log. The latest, an annotated version, has been submitted to the Court for *in camera* review.

As Plaintiffs note, the log contains documents withheld on the basis of work-product doctrine that Defendants have not listed as at-issue in this Motion. (Doc. 54-1 at 21). These appear to be the same category of documents Plaintiffs previously coded as: "Documents where the file names or description indicated that the material is unrelated to legal advice or work product (Blue)[.]" (*Id.* at 4). Defendants appear, per comments in the annotated log, to have waived work-product protection on these documents and agree they should be produced.

4

Further, Plaintiffs have indicated documents which Defendants put at issue in this Motion (and submitted to the Court for *in camera* review) which have not yet appeared on a privilege log. (*Id.* at 21; Doc. 54-11 (highlighting the particular documents)). Defendants represent the log continues to be updated along with the "rolling production of documents" and is not yet final. (Doc. 60 at 16).

The annotated privilege log lists 553 documents withheld by Defendants. Among those documents, there are some for which Plaintiffs do not challenge the assertion of privilege, some not requested by Plaintiffs, some for which Defendants have since waived work-product protection, and some for which the only asserted privilege is attorney-client communication—the application of which has not yet been fully briefed by the parties. Defendants therefore initially purported they would submit 369 documents withheld on the basis of work-product doctrine for the Court's review. (Doc. 60 at 5). But in subsequent communication with the Court, they indicated that this number was actually 368 documents, because one document (TMCN_CTRL0002916) had a file name beginning with "~$" which indicated it was a temporary file automatically deleted by their system. At least one other document Defendants attempted to submit (TMCN_CTRL0000365) had a file name beginning with the same temporary file indicator and was therefore not submitted in its native format. Accordingly, 367 documents appear to be at-issue for work-product protection.

Plaintiffs urge the Court to compel production of not only the submitted documents but also the "documents improperly withheld on the assertion of attorney-client privilege, and production with redactions of certain documents that Plaintiffs anticipate will contain *bona fide* privileged material but also relay critical underlying facts . . . ." (Doc. 54-1 at 1–3).

### A. Work-Product Doctrine

Broadly speaking, Defendants assert that their media strategy and communications with patient families are worthy of work-product protection because they were prepared in conjunction with attorneys and in anticipation of litigation. (Doc. 50 at 6–15). Plaintiffs respond that Defendants' claims of work-product protection are too vague to pass muster. (Doc. 54-1 at 8–21).

Rule 26(b)(3) of the Federal Rules of Civil Procedure codifies work-product doctrine, protecting "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . ." under certain circumstances. Fed. R. Civ. P. 26(b)(3). The doctrine "permit[s] an attorney to 'assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . to promote justice and to protect [his] clients' interests.'" *Carr v. Lake Cumberland Reg'l Hosp.*, No. CV 15-138-DLB-HAI, 2017 WL 5490916, at *2 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)). Importantly, "[t]he work product doctrine . . . does not protect the discovery of underlying facts, including facts concerning the creation of work product or the facts contained within that work product." *Bobalik v. BJ's Rest., Inc.*, No. 3:19-CV-0661-RGJ-LLK, 2020 WL 7241060, at *5 (W.D. Ky. Dec. 9, 2020) (citation omitted).

Pertinent here, Defendants, as the ones claiming work-product protection, bear the burden of establishing that each withheld document was prepared in anticipation of litigation. *Gruenbaum*, 270 F.R.D. at 303 (citing *U.S. v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006)). Defendants may carry their burden "'in any of the traditional ways in which proof is produced in pretrial proceedings such as affidavits made on personal knowledge, depositions, or answers to interrogatories.'" *Id.* at 304 (quoting *Roxworthy*, 457 F.3d at 597). An "'affidavit containing conclusory statement[s],'" however, is not enough. *Id.* at 305 (quoting *Roxworthy*, 457 F.3d at 597).

6

In determining whether the anticipation of litigation standard is met, the Sixth Circuit has adopted the "because of" test. *Cooey v. Strickland*, 269 F.R.D. 643, 647 (S.D. Ohio 2010). That inquiry centers on whether documents were "prepared or obtained because of the prospect of litigation[,]" as opposed to those "prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for non-litigation purposes[.]" *Id.* (quoting *Roxworthy*, 457 F.3d at 593). "Thus, if the item would have been prepared in substantially the same manner, regardless of the anticipated litigation, the doctrine does not apply." *Id.*

Defendants say that affidavits from Ms. Murray, Vice President and Managing Counsel of Provider Operations, and Melissa Lander, Vice President of Communications for Trinity, sufficiently establish that the documents were prepared in anticipation of litigation. (Doc. 50 at 8–11). Affidavits supporting work-product protection must be "specific and detailed to indicate that the documents were prepared in anticipation of litigation . . . ." *Toledo Edison Co. v. G A Techs., Inc., Torrey Pines Tech. Div.*, 847 F.2d 335, 341 (6th Cir. 1988). And "application of [work-product protection] will be rejected where the 'only basis' for the claim is an affidavit containing 'conclusory statement[s].'" *Roxworthy*, 457 F.3d at 597 (quoting *Guardsmark, Inc. v. Blue Cross and Blue Shield of Tenn.*, 206 F.R.D. 202, 210 (2002)).

Ms. Murray's affidavit purports that in-house counsel were an "essential part of the Incident Command Team from the beginning." (Doc. 50-2, ¶8). And though "Defendants employed their existing public relations firm" to craft their statements, she says this work was done at the direction of counsel and the Incident Command Team. (*Id.*). More specifically, she says, because Defendants "anticipated that their public statements could result in litigation given . . . the possibility that [ ] employees would be terminated" and might also "be used in medical malpractice lawsuits against them[,]" Defendants drafted public statements with the "advice,

7

guidance, and direct participation of counsel." (*Id.*, ¶¶ 12–13). Ms. Lander's affidavit says the same. (*See* Doc. 50-3).

Defendants' application of these general statements to hundreds of documents, created over the course of many months, "is not the kind of 'specific and detailed' evidence required to invoke [work-product protection]." *Ohio A. Phillip Randolph Institute v. Smith*, 360 F. Supp. 3d 681, 693 (S.D. Ohio 2018) (quoting *Roxworthy*, 457 F.3d at 597). While the affidavits suggest that counsel had a degree of oversight over media strategy and communications, "the fact that general counsel may be involved in oversight does not make it self-evident that the documents prepared were prepared in anticipation of litigation." *Guardsmark*, 206 F.R.D. at 210. These affidavits declare that every document marked work-product on the privilege log was created in anticipation of litigation, without establishing that anticipation of litigation was the driving force behind any *particular* document. *See Ohio A. Phillip Randolph Institute*, 360 F. Supp. 3d at 693 (finding a similarly broad affidavit insufficient to establish work-product protection). Accordingly, the affidavits are not enough to protect the 367 documents.

Still, the Court's inquiry does not end with the affidavits, because other indica may show that documents were prepared because of litigation. Here, Defendants provided the privilege log and the documents themselves for review. Yet, the Court cannot conclude from its review of the privilege log or the documents themselves that work-product protection applies.

To begin, the at-issue documents were overwhelmingly drafted and edited by non-lawyers. In fact, the privilege log does not list any of the three attorneys from the Incident Command Team as the purported author of any of the documents. Numerous documents are accompanied by an editing and approval log. But in many cases, none of the three lawyers appear on those logs. When they do, they are typically one of numerous people who have contributed edits or approval to the

document, and often were not the final approving member or editor.  In those cases, it remains unclear what type of edits, if any, the lawyer provided.

This seemingly limited involvement of attorneys undermines Defendants' position that public statements and strategies were crafted with the "advice, guidance, and direct participation of counsel." (Doc. 52-2, ¶ 13).  For instance, Ms. Lander states that she added the editing and approval logs to the documents sometime after the Incident Command Team began its work because counsel's "review and oversight was so critical" to the project.  (Doc. 52-3, ¶ 10).  But this delayed implementation of the editing and approval log is incompatible with claims that counsels' oversight was critical "from the start" of the Incident Command Team's work.  (Doc. 52-2, ¶ 7).  And the infrequency with which attorneys appear on the logs also undermines the claims of crucial attorney oversight.

Further, the claims of privilege in Defendants' log are unspecific, offering no insight into how the documents were prepared in anticipation of litigation.  These claims are consistently rendered as "attorney work product regarding [a topic indicated by the document's file name]" without further indication of who contributed to the document, how they contributed, or for what purpose.

Finally, the documents on their face show that they were not prepared in anticipation of litigation.  The documents demonstrate concerns and strategy around, for example: rebuilding trust among Defendants and their patients, staff, donors, and the public; responding to media inquiries; managing social media; the potential financial impact on Defendants; continued insurance coverage in Defendants' hospitals; and protecting confidential medical information.  The documents were prepared because of these non-litigation purposes.  While those same non-litigation purposes may have important legal implications for Defendants, they remain

implications, and not the "driving force behind the preparation of each requested document . . . ." *Roxworthy*, 457 F.3d at 595 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992)).  Certainly, the documents do not contain the "mental impressions, conclusions, opinions or legal theories" of Defendants' counsel.  *Hickman*, 329 U.S. at 508.  When the documents do directly contemplate litigation, it is only the criminal prosecution against Dr. Husel as an individual, not litigation against Defendants.

Consequently, Defendants have failed to show that the contested documents are protected from disclosure under the work-product doctrine.  Because work-product doctrine is the only asserted basis for the protective order, good cause for granting a protective order has not been established, and Defendants' Motion for Protective Order is **DENIED**.  With respect only to the documents submitted for *in camera* review, Plaintiffs' Cross Motion to Compel Discovery is **GRANTED**.  Defendants are **ORDERED** to produce the materials submitted for *in camera* review to Plaintiffs.

### B. Attorney-Client Privilege

As noted, Defendants submitted for *in camera* review only those documents that they have withheld on the basis of the work-product doctrine.  (Doc. 60 at 5).  But Plaintiffs seek more than that.  They have moved to compel "materials withheld upon the assertion of attorney-client privilege . . . ." (Doc. 54 at 1).  Defendants respond that a decision regarding this production would be premature.  (Doc. 60 at 16).  The Court does not now elect to compel production of materials it has not reviewed firsthand.  Accordingly, with regard to those materials Defendants have withheld on the basis of attorney-client privilege, Plaintiffs' Cross Motion to Compel Discovery is **DENIED without prejudice**.

10

The Court does note briefly the bounds of the privilege. This, in part, is because Defendants so broadly claimed work-product protection. Because it is now incumbent on the parties to resolve their outstanding discovery disputes, the Court offers a framework for Defendants to weigh their claims of privilege against.

Unlike with work-product doctrine, Ohio law governs claims of attorney-client privilege. *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, No. CIV A 206-CV-899, 2007 WL 1500899, at *3 (S.D. Ohio May 18, 2007) (citing *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 472 (6th Cir. 2006)). Under the privilege, confidential attorney-client legal communications are permanently protected from disclosure, unless the protection is waived. *MA Equip. Leasing I, L.L.C. v. Tilton*, 980 N.E.2d 1072, 1079 (Ohio Ct. App. 2012) (citation omitted). The privilege provides:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*State ex rel. Leslie v. Ohio Hous. Fin. Agency*, 824 N.E.2d 990, 995 (Ohio 2005) (quoting *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998)).

Relevant here, when a communication involves both legal and non-legal matters, a court must "consider whether the predominant purpose of the communication is to render or solicit legal advice." *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 570 (6th Cir. 2015) (quoting *In re Cnty. of Erie*, 473 F.3d 413, 420 (2d. Cir. 2007)). This predominant purpose "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *Id.* (quoting *Erie*, 473 F.3d at 420–21). If, for instance, an attorney is one of numerous people consulted

11

on the word choice for a public statement, and it is not clear that the attorney is being asked for her advice on the legal implications of the word choice, the privilege should not apply.

The parties appear to agree that merely including an attorney as a recipient on an email does not render that email privileged. (*See* Doc. 54-1 at 24–35; Doc. 60 at 17). Again, Defendants are urged to consider, for each email they may claim is privileged, whether the predominant purpose of the communication is to solicit or render legal advice. Merely sending a proposed media strategy to an attorney is not equivalent to asking an attorney, when sending the same, "If we use this proposed media strategy, what are its legal consequences?" or "How might potential litigants use this media statement in claims against us?"

The parties also represent that several at-issue communications were shared with outside firms. The Court notes that, at least to the extent those communications were with an outside public relations firm, it is "generally true" that "disclosure of otherwise privileged documents to a public relations firm is a waiver of the privilege." *DRFP, LLC v. Republica Bolivariana de Venez.*, No. 2:04-cv-793, 2015 WL 6122988 at *2 (S.D. Ohio Oct. 19, 2015) (citing *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013) ("[T]o the extent [a PR firm] was performing public relations functions, its participation in attorney-client communications resulted in a waiver—even if those functions were related to various litigations in which [the client] was embroiled.")).

Finally, as the other contacts with outside firms appear to involve medical peer-review and an internal investigation into Dr. Husel's actions conducted by outside counsel, the parties are reminded that the attorney-client privilege protects communications relating to legal advice, not underlying facts. "[N]either the attorney-client privilege nor the work

12

product doctrine applies to prevent the disclosure of underlying facts, regardless of who obtained those facts."  *Graff v. Haverhill North Coke Co.*, No. 1:09-cv-670, 2012 WL 5495514 at *50 (S.D. Ohio Nov. 13, 2012) (citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 395 (1981)).

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Protective Order (Doc. 50) is **DENIED** and Plaintiffs' Cross Motion to Compel Discovery (Doc. 54) is **GRANTED IN PART AND DENIED IN PART**.  Defendants are **ORDERED** to produce the materials submitted for *in camera* review to Plaintiffs.  Further, the deadlines set out by the Court's April 27, 2021 Order (Doc. 43) are **VACATED**.  The parties are **ORDERED** to submit a joint proposed scheduling order for the remaining case deadlines on or before November 17, 2021.

IT IS SO ORDERED.

Date:   November 10, 2021                         /s/ Kimberly A. Jolson
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE

13