# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**REBECCA MCNEIL,** *et al.***,**

               **Plaintiffs,**                    **Case No. 2:20-cv-258**
                                                  **JUDGE EDMUND A. SARGUS, JR.**

        **v.**                                     **Magistrate Judge Kimberly A. Jolson**

**MOUNT CARMEL HEALTH SYSTEM,**
*et al.***,**

               **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants Mount Carmel Health System ("Mount Carmel"), Trinity Health Corporation ("Trinity Health"), and Edward Lamb's (collectively "Defendants") Motion for Summary Judgment. (ECF No. 80.) Plaintiffs Rebecca McNeil, Beth Macioce-Quinn, Earlene Romine, Edward Wright, Brandi Wills, Akeela Bowens, Chad Readout, Jessica Sheets, and Deron Lundy (collectively "Plaintiffs") have responded in opposition, (ECF No. 87), to which Defendants have replied (ECF No. 94). For the following reasons, the Court **GRANTS in part** Defendants' motion as to Plaintiffs' claim under the Lanham Act, 15 U.S.C. § 1125 (Count II). Further, the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims of defamation (Count I), wrongful termination (Count II), and false advertising under the Ohio Deceptive Trade Practices Act (Count IV).

## I.      BACKGROUND

This case arises from the wake left behind Dr. William Husel's[1] highly publicized termination from Mount Carmel and subsequent criminal proceedings. Plaintiffs, consisting of eight former Mount Carmel nurses and one former Mount Carmel pharmacist, all of whom worked

---

[1] The Court is aware that Mr. Husel no longer retains his medical license. However, for the sake of maintaining consistency with the Court's prior orders and Plaintiffs' filings, the Court will refer to Mr. Husel as "Dr. Husel."

with and around Dr. Husel, allege that Mount Carmel and its parent company, Trinity Health, engaged in a false advertising campaign aimed at convincing the general public that Dr. Husel, with the assistance of Plaintiffs, either harmed or killed up to 35 actively dying patients. This misinformation campaign allegedly smeared Plaintiffs' reputations both professionally and within their communities, resulting in diminished employment prospects and heightened difficulty obtaining work in their chosen field of healthcare. As such, Plaintiffs brought the instant action against Defendants claiming the following: defamation, wrongful termination, and false advertising under both the Lanham Act and the Ohio Deceptive Trade Practices Act. Because this Opinion and Order exclusively addresses Plaintiffs' lone federal claim—that is, Plaintiffs' Lanham Act false advertising claim—the Court primarily recites those facts that pertain to the federal claim.

### A. Dr. William Husel's Dosing Practices, Suspension, and Termination.

Between 2013 and 2018, Dr. Husel worked as an intensivist (a physician for an ICU) at Mount Carmel. While working in this capacity, Dr. Husel occasionally treated critically ill patients who were actively dying. Treatment of such patients sometimes required Dr. Husel to perform palliative extubations, in which the patient's breathing tube is removed. This extubation process may be accompanied with the administration of pain medication so as to reduce a patient's physical discomfort. For some of these critically ill patients, Dr. Husel ordered doses of fentanyl ranging from 200 to 2000 micrograms. (*See* Ex. A to Compl., ECF No. 8.) This dosing approach, which differed from those taken by his peers, sought to ensure that Dr. Husel's patients experienced as little pain as possible during terminal withdrawals of care. (Swanner Dep., ECF No. 87-12, PageID 3558-3560; Pls. Opp'n, ECF No. 87, PageID 3137.)

In late October 2018, Mount Carmel received a "VOICE" report raising concerns that Dr. Husel had prescribed unusually large doses of pain medication to a patient.[2] (Barga Dep., ECF No.

---

[2] The VOICE system allows hospital personnel to report patient care concerns via written message from any computer terminal in the hospital. (Defs. Mot. Summ. J., ECF No. 80, PageID 1775.)

80-2, pp. 111, 118-119, 124.) A few weeks later, Mount Carmel received a second VOICE report related to Dr. Husel's use of possibly excessive pain medication during a palliative extubation involving another patient. (Swanner Dep., ECF No. 80-4, pp. 36-37; Barga Dep., ECF No. 80-2, pp. 155-156.) And after this second report, Mount Carmel received a third VOICE report concerning Dr. Husel's prescriptions to a third patient. (Swanner Dep., ECF No. 80-4, pp. 45-46.)

The filing of these VOICE reports prompted an internal investigation, which uncovered additional patients for whom Dr. Husel had provided potentially excessive pain medication (Roth Dep., ECF No. 80-3, pp. 26-31, 50-51, 74; Lamb Dep., ECF No. 80-6, p. 47; McKibben Dep., ECF No. 80-7, pp. 35-36.) On December 3, 2018, based on the evidence reviewed, Mount Carmel suspended Dr. Husel. (Roth Dep., ECF No. 80-3, pp. 83-84.) A day later, he was terminated. (McKibben Dep., ECF No. 80-7, pp. 55-56.)

In late January 2019, following a review into Dr. Husel's dosing practices, the State Medical Board of Ohio suspended Dr. Husel's medical license, noting that his "continued practice presents a danger of immediate and serious harm to the public," and that he had "ordered, personally administered, or caused to be administered, inappropriate and excessive doses of controlled substances" to patients who "expired within minutes of receiving such medications." (Notice of Summary Suspension, ECF No. 80-12.)

### B.  Defendants Notify Third Parties and Develop Communications Plan.

On December 7, 2018, Mount Carmel informed the State Medical Board of Ohio and the Ohio Board of Pharmacy of its investigation. (Roth Dep., ECF No. 80-3, pp. 593-95.) Mount Carmel also notified the Franklin County Prosecutor, which led the Franklin County Prosecutor's Office to open its own investigation into potential criminal charges against Dr. Husel. (Roth Dep., ECF No. 80-3, pp. 181-82, 198-200.)

3

A few days later, Trinity Health retained Jarrard Phillips, a national communications firm to provide recommendations on a strategy to inform Defendants' employees and the community about their investigation into Dr. Husel's medication dosing practices. (*Id.* at 177-78; Lamb Dep. ECF No. 80-6, pp. 26-28; Lander Dep., ECF No. 80-11, pp. 20-21.) Magi Curtis, the lead partner at Jarrard, advised Trinity Health's head of marketing and communications of a concern that Mount Carmel or Trinity Health lacked policies or standards governing medications and dosages in connection with terminal withdrawals. (Curtis Email, ECF No. 80-44.) In such a scenario, Curtis noted that criminal charges against Dr. Husel or any of the nurses would be helpful to Mount Carmel and Trinity Health's public perception. (*Id.*)

On December 17, 2018, Dr. Roth (Trinity Health's Executive Vice President and Chief Clinical Officer) and Brett Justice (Mount Carmel's head of communications) met with the Franklin County Prosecutor for the purpose of discussing Mount Carmel and Trinity Health's desire to make a public disclosure without interfering with the their investigation. (Roth Dep., ECF No. 87-7, pp. 207-209.) During this meeting, the prosecutor's office gave its permission for Mount Carmel to contact the identified patients' families. (*Id.*)

On December 21, 2018, Jarrard provided Mount Carmel and Trinity Health with a finalized "Communications Plan and Playbook," identifying the "core messaging" for public communications. (ECF No. 87-54, PageID 3939–3946.) The plan featured four core messages:

1. Mount Carmel reported to authorities the findings of our recent investigation that determined a doctor in our intensive care unit ordered fatal doses of pain medication for at least 24 patients who were receiving end-of-life care.[3] These patients' families had requested that all life-saving measures be stopped.

[. . .]

2. We are committed to transparency in sharing information about this tragedy and doing the right thing.

---

[3] While the Communications Plan and Playbook states that Dr. Husel "ordered fatal doses of pain medication" the record establishes that Defendants' public statements consistently qualified Dr. Husel's dosing practices as being "potentially" fatal.

[. . .]

3. The acts of this doctor, along with the involved clinical staff, were a clear violation of how we care for patients at Mount Carmel.

[. . .]

4. We are sorry that this tragedy happened at Mount Carmel. Our staff are outstanding professionals who are committed to safe, high-quality care, and we are proud to serve more than 1 million patients every year. We're taking actions to ensure this never happens again at Mount Carmel or anywhere in our system.

(*Id.*, PageID 3942.) In addition to establishing the core messaging, the plan also identified the plan's "Key Audiences," which included both internal audiences (e.g., Mount Carmel's board, executive leaders, and employees and doctors) and external audiences (e.g., patients, regulators elected officials, local and national media, and Catholic leaders).  (*Id.*, PageID 3946.)

**C.  Defendants' Public Communications.**

Defendants planned to release a statement to the public regarding their internal investigation of Dr. Husel in late January 2019. (Lander Dep., ECF No. 80-11, pp. 119-20.) However, following media coverage surrounding the filing of the first medical malpractice action against Dr. Husel and Defendants, Defendants accelerated their timeline, making their first public statement on January 14, 2019. (*Id.*) This statement announced Defendants' investigation into Dr. Husel's dosing practices and included the core messages identified in the "Communications Plan and Playbook." (*See* Ex. D to Compl., ECF No. 8) The following day, Defendants released a statement to the press indicating "[o]ne of our foremost goals has been to fully cooperate with the prosecutor and other authorities." (Public Statements, ECF No. 87-67, PageID 4037.)

On January 22, 2019, Defendants issued another public statement consistent with their communication plan:

Based on what this doctor did to these near-death patients, we understand that some of these families may be considering legal action. We've apologized to these families, we've apologized publicly, and we're continuing to cooperate with law

5

enforcement and other authorities. We're also working to build additional safeguards so that a tragedy like this never happens again.

(*Id.* at PageID 4038.)

Two days later, Defendants released another statement identifying seven new patients:

We have identified seven additional patients who received excessive doses of pain medication that Dr. Husel ordered. One of the patients received an excessive and potentially fatal dose. The other six patients received excessive doses that went beyond providing comfort but were likely not the cause of their deaths. We contacted the loved ones of these patients because it was the right thing to do. This brings the number of patients involved to at least 34, and we anticipate we might discover more as our investigation continues.

[. . .]

We are investigating whether Dr. Husel ordered excessive doses of medication when there was still opportunity to explore if there were reversible causes of patients' immediate conditions.

(Jan. 24, 2019 Statement, ECF 87-48, PageID 3915.)

On February 19, 2019, Defendants issued another press statement explaining:

As previously reported, we have placed 23 colleagues, including three members of the management team, on administrative leave as we continue our internal investigation. In addition, our review has revealed that 11 former Mount Carmel colleagues may also have been involved in the cases relating to Dr. Husel.

(Public Statements, ECF No. 87-67, PageID 4040-41.)

Several days later, on February 22, 2019, Defendants provided the public with an update

on the status of their investigation:

As previously shared, we also have been investigating whether any of the affected patients received excessive doses of pain medication when there was still an opportunity for treatment to improve their immediate condition. We are aware of five cases in which this possibility is a concern, and we are reaching out to the loved ones of these patients to share this information.

[. . .]

Our internal investigation is ongoing, and we continue to share information and cooperate fully with authorities, including law enforcement.

(Feb. 22, 2019 Statement, ECF No. 87-49, PageID 3917.)

On February 28, 2019, following a joint statement from the Franklin County Prosecutor's Office and the Columbus Police Department announcing an investigation into Dr. Husel, Defendants released the following statement:

> We appreciate the candor of the Franklin County Prosecutor's Office and the Columbus Division of Police as well as their ongoing commitment to pursuing justice. The deaths of patients under the care of Dr. William Husel are tragic. The facts of these cases are complex, and the ongoing nature of the investigations means that new information can continue to surface. The total number of patients involved is at least 35. There were 29 patients who received potentially fatal doses of medication. The other six patients received excessive doses that went beyond providing comfort but it was likely not the cause of their deaths.

(Public Statements, ECF No. 87-67, PageID 4042.)

Defendants issued several public statements in March 2019. On March 8, Defendants reiterated to the public that Dr. Husel's actions resulted in a tragedy and that Mount Carmel was taking steps to ensure that a similar tragedy never happens again. (*Id.* at PageID 4043.) On March 11 and March 15, following the dismissal of several nurses named as defendants in civil cases, Mount Carmel publicly commented that the "dismissal of the [nurses] does not in any way alter the proceedings or Mount Carmel's desire to find out how this could happen and ensure that it never happens again." (*Id.* at PageID 4044.) In between these public comments, Defendants announced that "48 nurses and pharmacists," a group encompassing all Plaintiffs, were "under review" and had been placed on administrative leave. (March 13, 2019 Statement, ECF No. 87-50, PageID 3919.)

On April 22, 2019, Defendants publicized their settlements of three cases brought by several patients' estates:

> Today, we informed the court that we've resolved three of the lawsuits brought against Mount Carmel following the actions of Dr. William Husel. It is our hope that these resolutions will bring some measure of closure and comfort to the families affected by this tragedy. We are committed to doing what is right and fair, and we will continue to have discussions with attorneys and representatives of families with a goal of reaching resolution of these matters.

(Public Statements, ECF No. 87-67, PageID 4045.) Defendants reiterated this on May 24, 2019. (*Id.* at PageID 4046.)

On June 5, 2019, following the Franklin County Prosecutor's press conference announcing that Dr. Husel had been indicted on 25 counts of murder, Defendants issued the following statement to the press:

> We appreciate the County Prosecutor's leadership and his ongoing commitment to justice in this case. Following the discovery of the actions of Dr. Husel, we notified appropriate authorities, including law enforcement. We have shared information with them and will continue to fully cooperate throughout their investigation.

(*Id.* at PageID 4048.)

On July 11, 2019, Defendants publicly announced that their investigation was complete, and they were terminating a number of involved employees. (Ex. D to Compl., ECF No. 8.) Defendant Ed Lamb also announced his resignation as CEO of Mount Carmel in the same statement. (*Id.*)

**D. Third-Party Public Statements.**

Other persons publicly commented on the events surrounding Dr. Husel's dosing practices. Although the parties in this case have extensively documented the substantial number of third parties who have commented on the facts underlying this litigation, the Court will highlight a select few to give a flavor of the public discourse.

The very first public statement about the events that underlie this action were made in media coverage after the filing of the first medical malpractice suit against Dr. Husel. (Dr. Husel Articles, ECF No. 80-15 ("A wrongful death lawsuit filed against Mount Carmel hospital, [Dr. Husel], and other medical staff claims they intentionally gave a lethal dose of the drug Fentanyl to a 79-year-old woman in order to hasten her death"; "Lawyers say a medical expert called the amount of Fentanyl prescribed 'grossly inappropriate and excessive'").) This lawsuit would be the first of more than 30 lawsuits filed against Dr. Husel. (Dr. Husel Articles, ECF No. 80-15.)

While local and national media published "hundreds" of articles concerning Dr. Husel's use of pain medications (*see* Compl., ECF No. 8, p. 86), they were not the only third parties to publicly comment. In late January 2019, the State Medical Board of Ohio suspended Dr. Husel's medical license based on "clear and convincing evidence" that he had violated multiple sections of the Ohio Revised Code. (Notice of Summary Suspension, ECF No. 80-12.) The Medical Board also determined that Dr. Husel's "continued practice presents a danger of immediate and serious harm to the public." (*Id.*) On February 13, 2019, the Medical Board found that Dr. Husel "ordered, personally administered, or caused to be administered, inappropriate and excessive doses of controlled substances" to six patients, all of whom "expired within minutes of receiving these drugs." (Notice of Opportunity for Hearing, ECF No. 80-13.)

Law enforcement and prosecutors also issued public statements concerning their investigation into Dr. Husel. For example, on June 5, 2019, Franklin County Prosecutor Ronald O'Brien and Columbus Chief of Police Quinlan held a joint press conference announcing that Dr. Husel had been indicted on 25 counts of murder. At the conference, Mr. O'Brien stated that:

> William Husel, who had been administering doses of fentanyl at a level that they internally believed were inappropriate, and not for a legitimate medical purpose, and which they also believed were designed to hasten the death of the patients who were being treated.

(June 5, 2019 News Conference, ECF No. 87-75.) At the same conference, Chief Quinlan explained:

> A significant challenge unique to this investigation is that detectives needed to familiarize themselves with medical records' terminologies, practices and procedures in order to understand the difference between treatment and criminal activity.

(*Id.*) These indictments led to a months-long criminal trial that was broadcast live throughout the country and garnered extensive reporting and commentary.

As a final example, Ohio's Attorney General also shared his office's sentiment concerning Dr. Husel's actions, stating "[i]t looks like we've got a serial killer on the loose with a medical license and access to fentanyl," and "it's time to yank his license and let the police do their work." (Dr. Husel Articles, ECF No. 80-15.)

### E. Plaintiffs' Post-Mount Carmel Employment Struggles.

As alleged, because of Defendants' public statements, every Plaintiff faced significant impediments to obtaining similar work following his or her exit from Mount Carmel. Plaintiff Macioce-Quinn testified that following Defendants' public statements, she was "blacklisted" and no major Columbus hospitals would consider her job application. (Macioce-Quinn Dep., ECF No. 87-6, p. 112.)

Plaintiff Wells had a similar experience. She struggled to find any job in central Ohio, and employers would not consider her for ICU positions. (Wells Dep., ECF No. 87-18, pp. 90-92.) And when Plaintiff Wells did receive employment offers, they were revoked once the prospective employer learned about her association with Dr. Husel. (*Id.*)

After Mount Carmel fired Plaintiff Sheets, who was both an ICU nurse and an instructor at Mount Carmel College of Nursing, she did not find equivalent work; instead, she obtained a position at an ambulatory surgery center, which resulted in decreased annual earnings of more than $50,000 per year. (Sheets Dep., ECF No. 87-20, pp. 28-29; Pls. Opp'n, ECF No. 87, PageID 3196-97.)

Plaintiff McNeil, a clinical ethicist, spent 146 days unemployed before accepting a position as a teacher of pre-nursing at a high school. (*Id.* at PageID 3198.)

Plaintiff Wright, who worked as a nurse at Mount Carmel, has never been able to get another nursing position. (*Id.* at PageID 3199; Rule 26(a) Disclosures, ECF No. 87-62.)

Plaintiff Lundy, a pharmacist with Mount Carmel, spent several years unemployed while applying to at least 50 positions before finally finding new employment. (Lundy Dep., ECF No. 87-21, p. 23.)

Plaintiff Bowens was able to find new employment in her chosen field of healthcare (nursing), but she earns approximately $18,000 per year less than she did at Mount Carmel. (Rule 26(a) Disclosures, ECF No. 87-62.)

Plaintiff Readout spent almost three years unemployed before he could find similar employment. (*Id.*)

Finally, Plaintiff Romine, a registered nurse, spent some time unemployed before finding a new position that paid $50,000 per year less than what she had made at Mount Carmel. (Romine Dep., ECF No. 87-16.)

### F.  Procedural History.

On December 19, 2019, Plaintiffs filed a Complaint against Defendants in the Franklin County Court of Common Pleas, alleging that their public statements concerning their investigation into Dr. Husel's dosing practices defamed Plaintiffs (Count I), that Defendants wrongfully terminated several Plaintiffs (Count II), and that Mount Carmel and Trinity Health engaged in a false advertising campaign in violation of the Lanham Act (Count III) and the Ohio Deceptive Trade Practices Act (Count IV). Defendants removed the action to this Court on January 17, 2020, and thereafter filed a motion to dismiss Plaintiffs' defamation claims. The Court granted Defendants' motion in part, finding that several of the alleged defamatory statements were either not defamatory against certain Plaintiffs, or not defamatory at all. (*See* Opinion & Order, ECF No. 36.) Defendants have since moved for summary judgment on all of Plaintiffs' claims. (ECF No. 80.) Plaintiffs filed their opposition (ECF No. 87.), to which Defendants replied (ECF. 94.) This matter is ripe for review.

## II.    STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). However, "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment." *Gooden v. City of Memphis Police Dep't*, 67 Fed. App'x 893, 895 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## III.    ANALYSIS

Although Defendants moved for summary judgment on all of Plaintiffs' claims, the Court will begin—*and end*—its analysis with Plaintiffs' sole federal claim—that is, Plaintiffs' false advertising claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Section 43(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

12

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125. This creates two separate bases for liability: false association (§1125(a)(1)(A)) and false advertising (§1125(a)(1)(B)). *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Plaintiffs allege only false advertising.

To prevail on a false advertising claim, Plaintiffs must establish that Defendants (1) made a false or misleading statement of fact about its product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statement and harm to the plaintiff. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999). The Supreme Court also set forth two prerequisites that a plaintiff must satisfy under Section 43(a) of the Lanham Act: First, the plaintiff must be within the "zone of interests" protected by the Act, and second, the plaintiff must adequately allege that the defendant's violations of the Act proximately caused her injuries. *Lexmark*, 572 U.S. at 134. In other words, the plaintiff must first demonstrate that it "has a cause of action under the statute." *Id.* at 128.

Plaintiffs take the position that Defendants engaged in a false advertising campaign that misled and confused the public as to the healthcare services Plaintiffs (and Defendants) provided during the relevant period. (Pls. Opp'n, ECF No. 87, PageID 3265.) This campaign, in turn,

damaged Plaintiffs' reputations as healthcare providers, which significantly hampered their ability to obtain similar employment following their exit from Mount Carmel. (*Id.* at PageID 3267.)

Defendants, on the other hand, argue that the Court should summarily dismiss Plaintiffs' Section 43(a) claim because, *inter alia*, Plaintiffs do not satisfy the prerequisites necessary to have a cause of action. (Defs. Mot. Summ. J., ECF No. 80, PageID 1837–42.) The Court agrees.

## A. Zone of Interests.

Plaintiffs, consisting of eight former Mount Carmel nurses and one former Mount Carmel pharmacist, meet the first prerequisite to bring suit under the Lanham Act—that is, they come within the Act's "zone of interests." In determining the scope of the Lanham Act, the Act itself provides an "unusual, and extraordinarily helpful" statement identifying the interests it protects. *Id.* at 131 (citing *Halicki v. UA Communs., Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987)). Found in Section 45, the Act provides:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; *to protect persons engaged in such commerce against unfair competition*; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. §1127 (emphasis added). While most of the enumerated interests pertain to false association claims, false advertising claims generally only implicate the Act's interest in "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition[.]" *Lexmark*, 572 U.S. at 131. Although Section 45 does not clearly define the concept of "unfair competition," the Supreme Court has established that it is "understood to be concerned with injuries to business reputation and present and future sales." *Id.* Thus, "to come within the zone of interests in a suit for false advertising under [Section 43(a)], a plaintiff must allege an

injury to a commercial interest in reputation or sales." Satisfying the "zone of interests" test is "not especially demanding." *See id.* at 130.

> Plaintiffs argue that they come within the Act's "zone of interests" because:

> Defendants' false statements about their care of patients caused an injury to their reputations as healthcare providers, which is a commercial interest. Specifically, at the time of the Defendants' statements, each of the Plaintiffs were experienced nurses/pharmacists whose professional reputations were smeared by Defendants' false statements regarding their actions in connection with Dr. Husel's dosing practices.

(Pls. Opp'n, ECF No. 87, PageID 3267; *see also* Compl., ECF No. 8, pp. 138–40.) This meets the less-than-demanding "zone of interests" test. The Lanham Act only requires Plaintiffs to "allege an injury to a commercial interest in reputation or sales," and Plaintiffs' allegations, which involve damage to their professional reputations, do just that. As such, Plaintiffs have adequately established that they come within the Lanham Act's zone of interests.

## B. Proximate Cause.

Next, Plaintiffs must satisfy the Lanham Act's second prerequisite: proximate causation. This requirement bars suit for alleged harm that is "too remote" from the defendant's unlawful conduct. *Lexmark*, 572 U.S. at 133. Accordingly, "a plaintiff suing under §1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* Generally, it is "inadvisable" to "stretch proximate causation beyond the first step" of the causal chain. *Lexmark*, 572 U.S. at 139–40 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271-72 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006)) ("[T]he reason for that general tendency is that there ordinarily is a 'discontinuity' between the injury to the direct victim and the injury to the indirect victim, so that the latter is not surely attributable to the former (and thus also to the defendant's conduct), but might instead have resulted from 'any number of [other] reasons.'").

15

A recent decision from the Eastern District of Michigan is particularly useful in illustrating when it is inappropriate to "stretch causation beyond the first step." *See Geomatrix, LLC v. NSF Int'l*, No. 20-13331, 2022 U.S. Dist. LEXIS 170700 (E.D. Mich. Sep. 21, 2022). *Geomtatrix* arose from a dispute between competing onsite wastewater treatment manufacturers. *Id.* at *2. The plaintiff alleged, *inter alia*, that the defendants (consisting of competing manufacturers and a non-profit organization that certifies onsite wastewater products) engaged in a misinformation campaign that raised concerns about the effectiveness and environmental impact of plaintiff's products, which in turn eroded the confidence of state regulatory authorities in plaintiff's products, thereby causing regulators to withhold approval of the products, resulting in plaintiff's inability to sell its products in various states. *Id.* at *4–9. In dismissing plaintiff's false advertising claim on proximate cause grounds, the court noted that the "actual cause" of plaintiff's inability to sell its products was the independent decision of each state's environmental regulators to withhold their approval, as well as the "unique combination of internal and external variables" that drive each state's regulatory process. *Id.* at *32–33. Put differently, the court found it "impossible to trace a straight line from Defendants' alleged conspiracy to disparage [plaintiff's products] by questioning their effectiveness and environmental impact (the illegal conduct) to plaintiff's inability to sell its [products] in various states (the injury)." *Id.* at 32 (internal quotations omitted).

Like the plaintiff in *Geomatrix*, Plaintiffs here also wish to "stretch causation beyond the first step" of the causal chain. *See Lexmark*, 572 U.S. at 139–40. Plaintiffs attempt to link their injuries to Defendants' alleged false advertising campaign, which consisted of statements made by Defendants to the media, which the media subsequently repeated to the "general public (including but not limited to consumers of healthcare services in the state of Ohio and other healthcare providers)." (Pls. Opp'n, ECF No. 87, PageID 3262; Pls. 1st Resp. to Interrog. No. 7, ECF No. 80-36, p. 8.) These repeated statements, in turn, allegedly damaged Plaintiffs' professional

reputations, thus limiting Plaintiffs' ability to obtain equivalent work. (Pls. Opp'n, ECF No. 87, PageID 3262, 3267.)

But Plaintiffs causal chain rests on a reed too slender. First, the uncontroverted record paints a picture in which numerous parties made numerous public statements concerning Dr. Husel, making it "impossible to trace a straight line" from Defendants' statements to the media to the employment decisions of Plaintiff's prospective employers. *See Geomatrix*, 2022 U.S. Dist. LEXIS 170700, at \*32. Examples abound: On top of the "hundreds" of published articles that "vilified" Dr. Husel and those who provided him with assistance (Compl., ECF No. 1-3, p. 86), the Ohio Attorney General publicly declared that Dr. Husel was "a serial killer on the loose," and the State Medical Board of Ohio suspended Dr. Husel's medical license because his "continued practice create[d] a danger of immediate and serious harm to the public." (Dr. Husel Articles, ECF No. 80-15.) Additionally, the Franklin County Prosecutor held a press conference announcing 25 indictments against Dr. Husel for murder, and dozens of Dr. Husel's patients filed medical malpractice lawsuits alleging that he intentionally killed them. It is undisputed that these statements garnered the public's attention. Plaintiffs fail to explain why Defendants' statements, rather than the plethora of other attention-grabbing public statements (many of which arose from separate investigations into Dr. Husel), determined the hiring decisions of Plaintiffs' prospective employers.

Second, just as the state environmental regulators in *Geomatrix* exercised their independent judgment when declining to approve the sale of plaintiff's products, which the court noted was the *actual cause* of plaintiff's alleged injury, so too did Plaintiffs' prospective employers when they made their independent employment decisions not to employ Plaintiffs. Although each Plaintiff struggled to find similar work following her or his departure from Mount Carmel, not one provides anything more than a conclusory allegation linking Defendants' statements to the media to their

inability to obtain equivalent employment. (*See* Pls. Opp'n, ECF No. 87, PageID 3194–3202.) In fact, Plaintiffs do not even attempt to disentangle the alleged reputational harm caused by Defendants' statements from the other public statements discussed above, as well as the "unique combination of internal and external variables" that drive hiring decisions. *See Geomatrix*, 2022 U.S. Dist. LEXIS 170700, at *33. Plaintiffs' failure to do so creates a "discontinuity" between the injury to the direct victim (in this case, Defendants' direct competitors, such as other Columbus hospitals and ICUs) and the injury to Plaintiffs, such that "the latter is not surely attributable . . . to the defendant's conduct[], but might instead have resulted from 'any number of [other] reasons.'" *See Lexmark*, 572 U.S. at 140.

The Supreme Court cautioned the lower courts against "stretching proximate causation beyond the first step" of the causal chain—and this Court heeds their warning. *See id.* at 139–40. Plaintiffs have failed to show that their reputational injuries flow *directly* from Defendants' alleged false advertising campaign; as such, summary judgment in favor of Defendants is appropriate on this claim. *See Eastpointe DWC, LLC v. Wing Snob*, No. 19-13768, 2021 U.S. Dist. LEXIS 189188, at *17-18 (E.D. Mich. Sep. 30, 2021) (granting defendants' motion for summary judgment on plaintiff's false advertising claim where plaintiff failed to show that it suffered an economic or reputational injury flowing directly from defendants' allegedly false statements).

## C. State Law Claims.

The Court's jurisdiction is predicated on original jurisdiction over Plaintiffs' Lanham Act claim and supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(a). Plaintiffs' remaining claims for defamation (Count I), wrongful termination (Count II), and false advertising under the Ohio Deceptive Trade Practices Act (Count IV) all arise from Ohio state law. Because the Court grants Defendants' motion for summary judgment as to Plaintiffs' lone federal claim, the Court must decide whether to exercise supplemental jurisdiction over Plaintiffs' pendent

state law claims. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010) (in deciding whether to exercise supplemental jurisdiction over remaining state law claims, "a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity'"). Typically, after a district court dismisses all claims over which it had original jurisdiction, the balance of considerations weighs against exercising supplemental jurisdiction. *Id.* at 952. And "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009).

Here, as is often the case when a district court has dismissed all claims over which it had original jurisdiction, the balance of considerations weighs in favor of declining to exercise supplemental jurisdiction. The factors of fairness and comity principally militate in favor of remand—that is, the Court should avoid issuing needless state decisions. *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993); *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1054 (6th Cir. 1986) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.")

As for the consideration of convenience, a decision to remand will send this case to the Franklin County Court of Common Please. This forum, which sits in the same county as this Court, is equally convenient for the parties.

With regard to judicial economy, the Court recognizes that Defendants' motion for summary judgment is fully briefed and ripe for review; however, this factor alone does not change the Court's calculus. *See Fox v. Brown Mem'l Home, Inc.*, 761 F. Supp. 2d 718 (S.D. Ohio 2011) (remanding to state court to avoid needlessly deciding state law claims despite (1) the parties having completed discovery, (2) the district court having issued a prior order touching on the merits of the case, and (3) the presence of a fully briefed and ripe motion for summary judgment).

Finally, the Sixth Circuit has indicated that remand is also proper when a district court's resolution of an action's federal claims leaves the merits of the state law claims untouched. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521-22 (6th Cir. 2007) (affirming district court's discretionary dismissal of state law claims where the court's dismissal of the sole federal claim did not reach the merits of the state law issues). Here, the Court's resolution of Plaintiffs' Lanham Act claim, which found that Plaintiffs did not sufficiently establish the prerequisites for suit, did *not* resolve any related state-law issues; instead, the Court only answered—in the negative—whether Plaintiffs came within the class of plaintiffs authorized to sue under the Lanham Act. Given that the Court did not reach the merits of Plaintiffs' state law claims, Sixth Circuit guidance suggests remand is proper.

In sum, the interests of comity and fairness weigh most heavily upon the Court in declining to retain jurisdiction over Plaintiffs' state law claims—in particular, the avoidance of unnecessarily deciding issues of state law. Having considered the interests identified in *Gamel*, the Court remands this action to the forum best equipped to adjudicate Plaintiffs' claims: state court.

## CONCLUSION

For the reasons stated above, the Court **GRANTS in part** Defendants' Motion for Summary Judgment. (ECF No. 80.) The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants as to Plaintiffs' Lanham Act, 15 U.S.C. § 1125(a), claim (Count II). The Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims (Counts I, II, and IV), and therefore **REMANDS** this case to the Franklin County Court of Common Pleas.

The Clerk is directed to close this case.

**IT IS SO ORDERED.**

**11/29/2022**                              **s/Edmund A. Sargus, Jr.**
**DATE**                                    **EDMUND A. SARGUS, JR.**
                                            **UNITED STATES DISTRICT JUDGE**